LURA L. STEWART AND ANOTHER v. SAMUEL H. BOWMAN, JR. AND OTHERS.[1]

December 6, 1935.

No. 30,536.

[1]Reported in 263 N. W. 618.

544

Best, Flanagan & Rogers, Merrill Shepard, and James I. Best, for appellants.

Fowler, Carlson, Furber & Johnson, for respondents Bowman.

Junell, Driscoll, Fletcher, Dorsey & Barker, for respondent First National Bank and Trust Company of Minneapolis.

HOLT, JUSTICE.

Action for declaratory judgment that plaintiffs, as sureties on a loan of $25,000 made by defendant bank to Jenkins, Inc., evidenced by a promissory note in that amount, have equities superior to defendants Bowman, endorsers of the note. The court made findings of fact and conclusions of law that, as between plaintiffs and defendants Bowman, plaintiffs were primarily liable. Plaintiffs' motion for amended findings or a new trial was denied, and they appeal from the order.

For an understanding of the legal questions involved the following statement of the facts may be sufficient: Plaintiffs are widows, the one the mother and the other the grandmother of Donald Stewart, who was 24 years old when the transaction began from which this action arises. Donald and W. S. Jenkins, Jr. were, in

June, 1931, working for a stock and bond brokerage firm, Donald as a salesman on commission and Jenkins as head of the sales department and as an officer of the corporation. The two conceived the plan to go into the same business and incorporate as Jenkins, Inc. Neither had any funds. It was deemed necessary to have $10,000 for working capital and office equipment. Jenkins was to contribute his experience, and Donald was to furnish credit or security for a bank loan of $10,000. Jenkins had learned that plaintiffs owned some stock which they might obtain to be used as pledge for the loan. Plaintiffs desired to establish Donald in business. Jenkins interviewed plaintiffs, laid before them the bright prospects he and Donald had in the venture, and eventually the plaintiffs turned over to them 40 shares of the preferred and 400 shares of the common stock of F. H. Peavey & Company and 2,575 Independence Trust shares, to be used as collateral or pledged for the $10,000 loan. Jenkins arranged for the loan from the First National Bank of Minneapolis, pledged the stock of plaintiffs, except 300 shares of the F. H. Peavey & Company's common, as security for his $10,000 note. The 300 shares of F. H. Peavey & Company's common stock were retained by Jenkins. About the same time Jenkins had an opportunity to obtain the exclusive agency to sell an issue of the stock of the General Manganese Corporation in Minnesota and South Dakota, which would be very profitable if sales could be made. But, in order to obtain such exclusive right for Jenkins, Inc., 5,000 shares of the stock must be bought at five dollars a share. To obtain the funds for this purchase Jenkins negotiated a loan of $25,000 from the First National Bank, giving his note for that amount, secured by the endorsements of the defendants Bowman and by the pledge of the 300 shares of the F. H. Peavey & Company stock he had retained, as stated. Before the Bowmans consented to endorse the note they procured exhibit 5 from plaintiffs and exhibit S from Jenkins, the latter a contract dated August 6, 1931, reciting that Jenkins was about to acquire stock of General Manganese Corporation, that it was necessary to obtain the assistance of the Bowmans to borrow the requisite funds, that Jenkins was expecting to borrow from the First National

Bank, or elsewhere, the sum of $25,000 to carry out the purpose of obtaining the stock of General Manganese Corporation, and to that end the Bowmans "promise and agree to arrange for such loan to be made either by endorsement of the notes given therefor * * * and agree" that such a loan shall immediately be made to Jenkins, he to pay interest on the loan and renewals thereof and to be reimbursed therefor out of the profits of the sale of the stock. Coincident with the receipt of the loan the 5,000 shares of the General Manganese Corporation stock acquired were to be delivered to the bank as additional pledge for the loan, and as, from time to time, shares of such stock were sold the bank should apply as payment upon its loan ten dollars out of the purchase price received for each share, no share to be sold for less than $12.50 per share. All the money received by the bank upon the sale and not applied in payment of the loan was to be placed in a special deposit in the bank to the credit of the parties to exhibit S. Jenkins agreed, as a further security for the payment of the loan, to deliver to the bank 300 shares of the common stock of F. H. Peavey & Company fully endorsed in blank. Of the moneys received from the sale of the General Manganese Corporation stock, after payment of the loan and interest, Jenkins was to have one-half and the Bowmans one-fourth each. The contract contained this provision: "This contract is not intended to be and shall not be, in any degree, construed as an agreement of partnership or agency." It was signed by Jenkins and the Bowmans. It is conceded that it was executed for the benefit of Jenkins, Inc., of whose stock Jenkins and Donald Stewart owned one-half each. Exhibit 5 is in these words:

"Minneapolis, Minnesota,
"August 6, 1931.
"Mr. S. H. Bowman, Jr. and Mr. Frank F. Bowman,
"Minneapolis, Minnesota.
"Dear Sirs:
"This is to say to you that we are aware and hereby consent that three hundred (300) shares of common stock of The Peavey Company now owned by the undersigned may be pledged or hypothe-

cated by Mr. William S. Jenkins, Jr. as collateral security for any loan or loans required by him, whether made by either of you directly or with your assistance by others.

"Very truly yours,
"Orcelia A. Stewart
"Lura L. Stewart"

When the $25,000 loan was obtained, a document, exhibit O, signed by Jenkins and one of the Bowmans, was left with the bank, stating that the 5,000 shares of the General Manganese Corporation delivered to the bank could be withdrawn by Jenkins upon payment of ten dollars for each share withdrawn, such payments to be applied on the loan, and upon full payment thereof the remaining shares were to be delivered to Jenkins upon payment of ten dollars for each share, but the moneys so paid to be deposited in a special account to the credit of the parties. Therein Jenkins also agreed immediately to deliver to the bank to be held as further security for the repayment of the $25,000 loan "the following collateral—namely: Three hundred (300) shares of the common capital stock of Peavey Company, * * * fully endorsed in blank."

Plaintiffs allege in the complaint and testified at the trial that they never knew of the $25,000 loan; that they gave the Independence Trust shares, the 40 shares preferred, and the 400 shares of the common F. H. Peavey & Company stock to Jenkins to pledge for the $10,000 loan, and did not learn until recently that Jenkins had withheld from that pledge the 300 shares of F. H. Peavey & Company common which were subsequently pledged for the $25,000 loan. Donald, whose role in the transaction of the loans appears to have been merely that of an errand boy for Jenkins, admitted that he knew of the $25,000 loan and got plaintiffs to sign the consent the bank required and also exhibit 5 desired by Bowmans. Plaintiffs appear to have been deceived, but as against the Bowmans they are in no position to complain. The latter had no knowledge of the $10,000 loan or how plaintiffs' stock got into the hands of Jenkins. The $25,000 is still unpaid, plaintiffs allege that Jenkins, Jenkins, Inc., and Donald Stewart are all insolvent, and that the

bank refuses to enforce payment of the Bowmans, who are well able to pay the loan, evidenced by the renewal note endorsed by them. Plaintiffs' prayer for relief is that the court as between plaintiffs and the Bowmans adjudge the latter primarily liable for the payment of the loan. The court made findings of fact and conclusions of law in substance that plaintiffs' 300 shares of F. H. Peavey & Company common stock is the primary security for the payment of the loan of $25,000 and that the Bowmans are entitled to exoneration, to the extent that the collateral securities pledged to the bank will pay its $25,000 loan. As far as the 5,000 shares of the General Manganese Corporation stock pledged by the principal debtor and owner, Jenkins, Inc., being primarily liable, there is no question raised.

There are 54 assignments of error. It will be necessary to consider but few of them in order to arrive at a decision.

Plaintiffs' contention that the Bowmans were so interested in the purchase of the General Manganese Corporation stock that they might be considered partners with Jenkins and hence held liable with him as the actual borrowers cannot be sustained. The contract, exhibit S, specifically negatives the existence of partnership or agency relationship. Plaintiffs had no contact with the Bowmans and do not claim that they signed exhibit 5 in reliance upon any knowledge of exhibit S, or upon any representations of Bowmans, or their connection with the loan except what might be inferred from exhibit 5. There is no ground upon which plaintiffs may claim the Bowmans liable on the note held by the bank other than as endorsers before delivery, or, in other words, as sureties as. to any other sureties for Jenkins or Jenkins, Inc. It clearly appears from exhibit S that no partnership was intended. T. R. Foley & Co. v. McKinley, 114 Minn. 271, 131 N. W. 316. Plaintiffs have no reason to claim a partnership. They took no step in reliance upon the existence of a partnership.

The assignments of error which go to a vital point in the case are those relating to findings Nos. 4, 5, and 8. As far as finding 4 is concerned, it is fully sustained, except this of the quoted part placed in italics:

"* * * and that they would consent to, and would permit or cause the same to be pledged and deposited with said bank to *primarily* secure the payment of said loan and any extensions or renewals thereof, *for the purpose of protecting and to thereby protect, indemnify and save harmless the said Samuel H. Bowman, Jr., and Frank W. Bowman from liability or loss by reason of their doing the things aforesaid."*

Finding 5 reads:

"That in reliance upon and pursuant to the aforesaid proposals, representations and agreements, and upon the condition that they would be primarily secured against liability or loss in the premises by the pledge of said F. H. Peavey & Company common stock for the payment thereof, and furnished with the written consent of the plaintiffs to such use thereof, said defendants Samuel H. Bowman, Jr. and Frank W. Bowman made and entered" exhibit S.

The part of finding 8 to which objection could be made is:

"That upon delivery to them of the written consent [exhibit 5] of said plaintiffs to the aforesaid use of said 300 shares of F. H. Peavey & Company stock by them owned and upon being informed that said stock had been assigned, pledged and delivered to said bank to primarily secure the payment of said loan," that the Bowmans were thereby protected and secured against liability or loss in the premises and they endorsed the $25,000 note to the bank.

It is quite clear that the Peavey stock was not pledged to the Bowmans. It was pledged to the bank as collateral to the promissory note signed by Jenkins as maker and the Bowmans as endorsers. A pledge is made by delivery. The stock was delivered to the bank and is still held by the bank, to which pledging plaintiffs consented in writing. There is nothing in that consent nor in exhibits S or 5 purporting to pledge the stock to the Bowmans. Nor can it be spelled out of the testimony of Frank W. Bowman or Jenkins, the only persons who testified on that subject. Bowman testified that he asked Jenkins: "What collateral will you give us for putting our endorsement on the note?" After some further

and later talk, he was informed that Jenkins could get 300 shares of Peavey stock to use as collateral in addition to the Manganese stock to be purchased by Jenkins or Jenkins, Inc. The entire testimony of Bowman does not make out even an agreement to pledge the Peavey stock to the Bowmans, or to the bank for their protection. Jenkins' testimony does not even furnish a suggestion of pledging the Peavey stock to protect the Bowmans. We therefore conclude that the italicized part of finding 4, finding 5, and the quoted part of finding 8 are not sustained by the evidence unless that is the legal import to be gathered from exhibits S and 5 and the acts of the parties in executing and delivering the note and pledging the Peavey stock to the bank. The Peavey stock was actually pledged to the bank and not to the Bowmans. They did not, by exhibit S, reserve any control of that stock as they did of the pledged Manganese Corporation stock. In the instructions to the bank (exhibit O), signed by Jenkins and one of the Bowmans for both, Jenkins agrees that he will, upon the receipt of the $25,000 to be lent by the bank, "immediately deliver to the said First National Bank, to be held as further security for the repayment" of said loan the 300 shares of Peavey stock. There is no agreement that this pledge was to protect or indemnify the Bowmans.

The Bowmans by endorsing Jenkins' note became sureties as between themselves and the maker. Plaintiffs' stock by being pledged with the bank became surety for the debt as between the owners thereof and the debtor. The relation in which plaintiffs' stock and the Bowmans stand to one another in regard to this $25,000 note of the bank is that of cosureties. We fail to find in the situation presented by the evidence or the findings any superior equities in the Bowmans over the owners of the pledged Peavey stock. The former's purpose in becoming sureties on this large note was to realize a large profit from the venture of Jenkins and Jenkins, Inc., the maker of the note. Plaintiffs' purpose in delivering their Peavey stock to Jenkins to use as a pledge was to open an auspicious business career for Donald. The expectations of both ended in bitter disappointment. Exhibit 5 undoubtedly authorized Jenkins

to pledge the stock to the Bowmans to secure them against loss on their endorsement. But it was not so pledged. It could have been so pledged subject to the pledge to the bank. Pierce v. National Bank of Commerce, 268 F. 487. But, as already stated, it was not done. There is no pretext that there was an agreement to pledge to the Bowmans subject to the pledge to the bank. Neither exhibit S nor 5 indicates such a purpose or intention. There is no doubt that the Bowmans became endorsers in reliance upon the pledge of plaintiffs' stock to the bank to secure its note or loan, and that they considered it ample security so that they were absolutely protected against loss on their endorsement. But, since it was not pledged to them but to the bank to secure its note, the Bowmans as endorsers of the note must be considered as cosureties with the pledged stock, which did not belong to the borrower or maker of the note. Jones, Collateral Securities (3 ed.) § 517a, states:

"A person pledging his property as security for the payment of the debt of another stands in the position of a surety of the debtor."

And so does a mortgage given by one other than the borrower to secure the latter's note. We therefore conclude that as a matter of law, upon the undisputed facts in this case, the Bowmans and the 300 shares of F. H. Peavey & Company common stock owned by plaintiffs are cosureties for the loan of the bank, evidenced by the $25,000 renewal note of the original note made by Jenkins; that is, as between the stock and the Bowmans, if the latter are obliged to pay the note, they can have recourse to this Peavey stock for one-third of the amount so paid by them, and should the stock be applied by the bank in payment of the note, plaintiffs, as the owners thereof, would be entitled to contribution from each of the Bowmans for one-third of the amount so paid. This conclusion necessitates a modification of the findings.

We think no error was committed by the court in receiving parol testimony in regard to the pledging of the Peavey stock to the Bowmans. The trouble with the testimony and the inferences from what was done is that it shows only a pledging to the bank of that stock and not to the Bowmans.

552

There is nothing in the point urged by plaintiffs that by extending the time of the loan by successive renewal notes the pledged stock was released. Plaintiffs signed and delivered to the bank their express consent to renewals of the note without notice to them, exhibit F, containing this language, "and I hereby consent to their use as collateral security for the indebtedness aforesaid and all renewals or extensions thereof."

The 300 shares of F. H. Peavey & Company common stock and the defendants Bowman are cosureties as between themselves, and neither has primary equities over the other. The pledged General Manganese Corporation stock owned by the borrower is primarily liable as between plaintiffs' stock and defendants Bowman.

The order is reversed and the cause remanded to the trial court with direction to amend the findings of fact and conclusions of law in conformity herewith.

JULIUS J. OLSON, JUSTICE (dissenting).

No one questions the right of the bank to hold or to proceed with enforcement of the collateral here involved. Nor is there any doubt that to the extent the collateral may fall short of making good the loan the Bowmans must make good. The sole question for decision is whether the court below was right in holding that as between plaintiffs and the Bowmans the collateral should first be used before calling upon them for contribution. To obtain a clear view of the situation the facts should be more thoroughly stated than they have been in the opinion.

When Jenkins had the chance of procuring the exclusive agency for the sale of the Manganese stock he at once sought to raise the requisite funds with which to purchase the 5,000 shares which he had to acquire before getting this exclusive agency. In seeking this accommodation he on many occasions conferred with the Bowmans for the purpose of getting the required aid. They as conservative business men realized the speculative qualities of the Manganese stock and promptly informed Jenkins that they would not enter into any deal unless he put up collateral for the $25,000 required to make that purchase. These negotiations extended over a period of more than two weeks. Jenkins informed them that he had some

Peavey company common stock. The Bowmans refused his first offer of 200 of these shares, they insisting upon 500. But they finally got together upon the proposition that 300 shares were to be put up by him as collateral in addition to the Manganese stock. The Bowmans learned that these shares did not belong to Jenkins so they insisted that he procure the requisite authority to pledge the shares, hence exhibit 5, quoted in the opinion, was procured by Jenkins from the plaintiffs. This instrument was addressed to the Bowmans, and by the terms of that exhibit Jenkins was authorized to put the same up "as collateral security for any loan or loans required by him [Jenkins] *whether made by either of you directly or with your assistance by others.*" (Italics mine.) After this instrument had been procured it was delivered to the Bowmans, whereupon they and Jenkins entered into the contract referred to as exhibit S. Under the terms thereof the Bowmans promised and agreed "to arrange for such loan [$25,000] to be made either by endorsement of the notes given therefor or in such other manner as they shall desire." They also agreed thereby that the aforesaid sum should "be immediately loaned to" Jenkins and required that (paragraph five of agreement) the 300 shares of Peavey stock were to be at once deposited with the bank as security for the loan so to be made. In conformity with this arrangement the Bowmans endorsed the note which, with the collateral going with it, was taken to the bank and there delivered, the loan duly negotiated, and Jenkins credited with the amount thereof. Mr. Stirling, for the Bowmans, accompanied Jenkins to the bank and saw to it that the note and collateral were turned over to the bank in accordance with the agreement. Thereby they completed their bargain. The testimony is clear that they would under no circumstances have entered into this deal unless this collateral was procured and pledged as security for the loan. That was a condition precedent to their endorsement of the note, a very material part of the consideration entering into the transaction. While the bargain so made may seem harsh, there can be no doubt that these men had a perfect right to insist upon such security as they deemed adequate to protect themselves against loss. Fraud and deceit being entirely

absent, no legal reason, so it seems to me, exists for denying them the protection they bargained for and obtained. All concerned in the transaction hoped and expected that the Manganese stock would prove profitable. If the 5,000 shares had been sold at the stipulated price there would indeed have been large profits for the parties directly concerned. The stock turned out, as many such speculative stocks do, a poor gamble. It is obvious from the record before us that resort must be had to the collateral, and perhaps also to the Bowmans as accommodation endorsers.

But it is not fair to claim that the Bowmans took no chances. Before they consented to the acceptance of only 300 shares of the Peavey stock they made inquiry in respect of its market value. The information gained was that while there was no ready market for such stock it should be reasonably worth at least $100 per share. Naturally they concluded that the 300 shares would afford them reasonably adequate protection. But if that stock had dwindled in value by as much as 50 per cent they stood to lose a very considerable sum of money. These men being experienced in business of this nature knew and appreciated the dangers incident to this form of security. The stock market crash of 1929 was undoubtedly fresh in their minds. We should not, if legally possible to avoid it, place anything in their way to defeat what they and Jenkins sought to accomplish. Of course the Bowmans had no recourse against plaintiffs, as the limit of their liability was the pledged stock. The Bowmans' liability was absolute to the full extent that the collateral failed to meet the loan.

From the record it seems very clear to me that the Bowmans agreed to lend their credit in the making of this loan, provided Jenkins furnished the collateral required by them. They had nothing to do with the procurement thereof. That was up to him to furnish. Clearly, then, Jenkins was not their agent in the procurement of exhibit 5. As between them and Jenkins, there can be no doubt in point of fact respecting the arrangement made.

The law sustains such transaction. It is a matter of common knowledge that a surety oftentimes demands indemnity before assuming his suretyship. That is done almost invariably by surety

companies underwriting obligations of that nature. So we find in 50 C. J. p. 284, [§ 471] (3):

"A surety may, at the time of entering into the relation, stipulate for security or indemnity for his exclusive benefit, and in the absence of imposition or fraud, or a showing that the security or indemnity was intended for the benefit of all, the cosureties have no right to participate in the security or indemnity thus obtained, except to the extent of the surplus remaining after the exoneration of the surety obtaining it."

This statement is fully supported by the cases cited in the notes.

Respecting pledges and the forms and requisities of such contracts, see 49 C. J. p. 904, [§ 24] F, where this rule is stated:

"In order to constitute a pledge of personal property there must be a contract whereby the property is to be held as security. It is not essential that the contract shall be expressed in any formal manner; and generally it need not be in writing, but may be oral; and, where it appears that the minds of the parties have met, it may be implied from the facts and circumstances of the particular case."

The cases cited in the notes pertaining to the quoted language sustain the text.

It is idle for plaintiffs to assert that they are uncompensated sureties. They are not. True, the consideration did not run to them directly, but it did run to and for the benefit of the son and grandson, Donald A. Stewart. They were interested in his future career. Jenkins and Donald were the ones that brought about plaintiffs' participation in the transaction. To the Bowmans the plaintiffs were total strangers. They never met or knew anything of each other until the time the case was tried.

As I view the facts in this case there is not the slightest doubt that the arrangement found by the trial court in fact existed. We are only concerned here in respect of whether the evidence reasonably sustains the trial court in that regard. A careful examination of the record leads me to the conclusion that no other finding could be made.

The result here obtained is that this court is making a contract for the parties that was not contemplated and certainly not made by anyone connected therewith. I am opposed to judge-made contracts; therefore I dissent.

DEVANEY, CHIEF JUSTICE, and LORING, JUSTICE, took no part in the consideration or decision of this case.

